Filed 8/22/23  P. v. Ruiz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSCAR CATALAN RUIZ,<br><br>    Defendant and Appellant. | F084254<br><br>(Super. Ct. No. 19CMS-4644)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Kathy Ciuffini, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Oscar Catalan Ruiz began touching V., his stepdaughter, inappropriately when she was around 11 years old. On more than one occasion, defendant told V. if she did not let him touch her, or if she told anyone, he would hurt or even kill her mother and possibly her siblings. Defendant used this threat to force intercourse with V. on more than one occasion. Eventually, V. told her sister and grandmother about the incidents and V.'s mother called law enforcement.

V.'s mother testified she applied for a U visa, for which victims of crime could apply. The trial court allowed questions related to the visa, limited to showing the witness's state of mind, and denied defendant's request to present expert testimony on the nature of the visa.[1]

For the defense, defendant's daughter A. testified she had been physically abused by defendant, but that he never sexually abused her. Defendant testified on his own behalf at trial, denying the allegations against him.

The jury found defendant guilty on all counts as charged: lewd acts on a child under 14 years old (Pen. Code, § 288, subd. (a), count 1),[2] forcible lewd acts on a child under 14 years old (§ 288, subd. (b)(1), count 2), and three counts of rape of a child under 14 years old (§§ 261, subd. (a), 269, subd. (a)(1), counts 3, 4 & 5). The court sentenced defendant to an indeterminate term of 45 years to life for counts 3, 4 and 5; and a consecutive determinate term of 14 years, which was the middle term of eight years for count 2 plus a full consecutive middle term of six years for count 1.

---

[1]    A U visa allows a person who is a victim of certain crimes, including domestic violence and sexual abuse, and who assists law enforcement to remain temporarily in the United States. (See 8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14 (2023); *People v. Villa* (2020) 55 Cal.App.5th 1042, 1047, 1050 (*Villa*).) The record also refers to this as an O visa occasionally, but such references have been edited to U visa for consistency purposes in order to eliminate confusion.

[2]    All statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant claims the trial court abused its discretion when it denied defendant's request to present expert testimony on the nature of a U visa. Next, defendant claims that his attorney rendered ineffective assistance of counsel (IAC) by eliciting testimony from A. that defendant physically abused her and for not objecting to the prosecutor's cross-examination of A. regarding the physical abuse. Last, defendant claims the trial court improperly imposed full, consecutive sentences on counts 1 and 2. The People disagree with defendant's claims and contend the trial court properly exercised its discretion in excluding the expert testimony, defendant failed to demonstrate his attorney rendered IAC, and that the consecutive terms were authorized under section 667.6, subdivision (d).

We reject defendant's contentions, but conclude the matter must be remanded for resentencing on other grounds pursuant to section 667.6, subdivision (d). In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

V. and her grandmother, Blanca, were living in El Salvador when they witnessed a murder in front of their house. The people who did it threatened to kill Blanca and V. if they said anything to the police. Because they were scared, Blanca and V. traveled to the United States in October 2016, arriving first in Texas. In November 2016, V. moved from Texas to California to live with her mother, Wendy. This was the first time V. remembered seeing Wendy in person. Blanca came to California on February 2, 2017.

Wendy was living on Ivy Street in Hanford with defendant, defendant's mother Ana C., and Wendy's daughters A. and J. Defendant was introduced to V. as her stepdad. V.'s birthday is November 23, 2005. When she moved to the United States, V. was almost 11 years old, A. was about 8 years old, and J. was about 5 years old. The Ivy house had one bathroom, a bedroom at the front, then a living room, kitchen and another bedroom in the back. The entire house had carpet at the time, but it was changed to a

hardwood type floor in 2017.  In November 2016, Ana C. slept in the front bedroom by the front door, and Wendy, defendant, and J. slept in the back bedroom by the kitchen.  In anticipation of V.'s arrival, Wendy bought a bunk bed and V. and A. slept on the bunk bed in the living room.  According to V., there was just one bed and a couch and V. and A. would alternate sleeping on the bed and the couch.

Wendy worked at a packing house from November 2016 until March 2017, when she went out on disability related to her pregnancy.  Wendy worked Monday through Friday, starting at 7:00 in the morning, but her shift ended at varying times.  Wendy shared a room with defendant and J. at the time.  Wendy typically fell asleep first.

V. testified she did not have a very close relationship with defendant; she barely knew him.  One night while V. was sleeping on the couch, V. got up to get a cup of water from the kitchen and saw defendant.  V. was wearing a shirt and shorts and defendant was wearing only his underwear.  Defendant touched her on her chest with his hands, over her shirt.  V. said it felt like he was touching her a long time and she was not comfortable with it.  Defendant apologized and told her not to say anything and to stay quiet.  V. did not recall when this first incident happened, but Blanca had not arrived in California yet, and A. was asleep in the living room.  V. did not tell anyone because defendant told her not to.

Another incident occurred before Christmas break in 2016, when V. stayed home from school.  It occurred in the morning while Wendy was at work, Ana C. was in the front room, and A. and J. were at school.  V. was helping defendant make his bed when defendant grabbed V. by the legs and pulled her towards him.  V. was facing up and defendant positioned his body close to her.  V. told defendant she felt uncomfortable and he said "'Oh, there's nothing wrong with this .…'"  V. continued to say she was uncomfortable and he apologized and let her go.  V. did not tell anyone because defendant told her not to tell anyone.

4.

V. believed Wendy bought a bunk bed after Blanca arrived in February 2017. Blanca slept on the bottom bed while V. and A. continued to alternate between sleeping in the top bed and the couch. V. recalled that when you turned over in the top bunk it would squeak, but it did not shake. The couch did not make any noise when you moved.

From February 2017 through June 2017, V. recalled incidents when defendant touched her again. Wendy had complications with her pregnancy and was in and out of the hospital during that time. Blanca was working during the night and V. took care of her siblings until defendant came back from work. V. could not recall if Ana C. was living there at the time because even when she was there, she barely left her room.

One night while V. was sleeping on the couch, defendant got close to her and tried to touch her, which shocked her awake. V. was uncomfortable and scared. Defendant told V. not to say anything and threatened V. that if she did not let him touch her he would kill her mother. V. was scared because Wendy was pregnant and she did not want anything to happen to Wendy or the baby. Because of this, V. let defendant touch her; she felt defenseless. At the time, A. was asleep on the top bunk, J. was asleep in the back bedroom, and Blanca was working. Defendant put his hands under V.'s shirt to touch her chest slowly and reminded V. not to say anything.

Wendy went back to the hospital on June 26, 2017, and her baby boy, C., was delivered by C-section. Another incident occurred when Wendy had to stay at the hospital after having C. That night, Blanca was working, and defendant was sleeping with A. and J. in the same bed, but V. chose to sleep on the top bunk bed. However, defendant picked up V. from the top bed and carried her to the same bed where he and her sisters were sleeping in the front room. Defendant laid V. next to him, which made V. very uncomfortable. V. tried to get up and move back to the bunk bed, but defendant hugged her so she could not move. J. got up to hug V. and V. told her we should move to another place, but defendant said no. So V. switched places in bed with J. Nothing else happened during that incident. V. was 11 years old at the time.

5.

One morning, defendant told V. to warm up a tortilla for him while Blanca was preparing coffee for him. V. accidentally burned the tortilla, which made defendant angry. Defendant told V. that she could not even warm up a tortilla right, grabbed the tortilla, and threw it at her face. The tortilla hit V. in the face, causing her to cry because the tortilla was really warm. Wendy came out of the back bedroom to see V. crying and wiping her tears. When Wendy saw defendant intended to hit Blanca, she got in between them because she was the victim of violence and did not want defendant to hit her mother. Defendant kicked Blanca out of the house and Wendy decided to leave with her children while defendant was at work. They moved out of the Ivy house around June 28 or 29, 2017, and stayed in Huron for about a week. Defendant asked Wendy to forgive him and come back because they were a family and had a newborn baby.

Wendy moved back into the house on Ivy Street with her children, but neither Blanca nor Ana C. returned. When they moved back, Wendy, defendant and C. slept in the front bedroom, while V. and her sisters slept in the back bedroom where each of them had their own bed. Even though they had their own beds, J. would often sleep with V. in her bed. When V. was back at the Ivy house, defendant would wait until Wendy was sleeping deeply and go into V.'s bedroom, lie in bed with V., and touch her. V. would often wake up to defendant in her bed with his arm hugging her. Sometimes, defendant would turn V. around and pull her close to him. V. would try to push back or get away or, if her sister was in bed with her, she would switch places with her sister. Defendant would pull V. towards him to put her on top of him while he was facing up. Defendant would then hold V. by the hands and tell her not to make a sound. During these incidents, defendant would still tell V. that he would kill her mother if she did not let him touch her or do whatever he was doing to her. V. said she loved her mother and did not want anything to happen to her.

V. described a specific incident during which defendant tried to take V.'s shirt off, but he heard a noise, got scared, and pushed her off. V. was wearing a shirt and

6.

sweatpants and defendant was only wearing underwear. Defendant's hands had been moving up towards V.'s chest when he heard the noise and pushed her off. When defendant pushed V. off, he told her not to say anything or make a sound.

On another incident, defendant ended up taking V.'s shirt off. That night, Wendy was awake and defendant told her he was going to sleep with the girls. V. made sure J. was between her and defendant, but defendant moved J. so he could be close to V. Defendant told V. not to make any noise and not to attempt to yell because he would hurt her mother. Defendant took off V.'s shirt and started touching her. Defendant placed his hand over V.'s mouth and told her to let him do this. Defendant then started taking off V.'s sweatpants and he started to pull down his underwear. Once again, he warned V. not to make any noise or say anything because he would hurt her mom. Then, defendant pulled down V.'s underwear and he touched her in a very uncomfortable way. V. did not want him touching her, but he kept threatening her. Defendant touched V.'s breasts and her private part in front with his hand. Defendant was touching her skin under her clothes. Defendant removed his underwear and put his private part inside her private part, which she described as very uncomfortable. Then, defendant moved V. off of him and told her not to say anything or he would do something to her mother and possibly her sisters. V. said defendant did this to her a lot of times. Defendant would either wait for Wendy to fall asleep or he would say he wanted to sleep with the girls. It became difficult for V. to fall asleep because of what defendant was doing.

One night, V. heard defendant use the restroom and then defendant got into bed next to her. Defendant hugged V. and told her not to move. He turned V. to face him, told her not to get spooked, and he got on top of her. They were facing each other, and he was laying on her with his entire body. Defendant took off V.'s shirt, pants and underwear. He took off his own underwear and put his private part inside of V.'s private part. V. was uncomfortable and said it lasted a long time. The incident ended when one

7.

of V.'s sisters started moving. Defendant got off of V., put on his underwear, and left the room.

The last incident occurred when defendant was upset at Wendy. Wendy learned defendant had been unfaithful to her and defendant was sleeping on the couch after drinking all day. When going to bed that night, the sisters closed their bedroom door, but defendant told them to leave it open. A. went to sleep on J.'s bed and J. got in bed with V. After her sisters fell asleep, defendant went to lay in V.'s bed and covered her mouth. He told her not to make a noise and that he was very mad at her. Defendant whispered to V. that it was her fault his life was ruined and called her "uncomfortable" names. Defendant accused V. of telling Wendy that defendant was unfaithful to her. Defendant pressed down on V.'s mouth and she got very scared. Defendant laid on top of V. and said she should allow him that night because he was capable of killing her mother and harming her sisters and brother. He also threatened to send Blanca to immigration. Defendant took off V.'s shirt, sweatpants, and underwear as well as his own underwear. Defendant then put his private inside V.'s private and moved his body up and down. V. described it as uncomfortable, and she felt ashamed and disgusted with herself. Afterwards, defendant told V. it did not matter what V. allowed him to do anymore because he was still going to harm her mother and grandmother.

Around March 3, 2018, Wendy and her children moved out of the Ivy house into an apartment on Silverado after defendant hit Wendy. V. felt scared of defendant when she learned defendant hit Wendy. V. still had not told anyone at that time what defendant had been doing to her. While living on Silverado, V. saw defendant's car at the entrance of their apartment.

In 2019, the family moved to a house on Tony Drive in Hanford because they no longer felt safe at the Silverado place. On August 31, 2019, V. told her sister A. about what defendant had done to her. When Blanca arrived home after work, V. told Blanca that while Blanca was at the detention center in Texas, defendant had touched her

intimate parts. V. said defendant put his private part inside her private part many times. Blanca did not ask V. anymore details about the incidents because V. was crying. V. told Blanca that the incidents also happened when Blanca worked nights and Wendy was at the hospital. Defendant had told V. that if she did not allow him to touch her, Blanca would be deported and she would never get out of there. V. was 13 years old at the time and was crying and trembling while she was talking. Blanca called Wendy and told her to come home. When Wendy came home, Blanca and V. told her what happened to V. and Wendy called the police.

V. spoke with the police about what happened multiple times. V. said it was very difficult for her to tell the police and she did not tell them what fully happened because she was still scared. Defendant told V. he could touch her like that because she was not his daughter. V. said she always slept in the same room with A. and sometimes Blanca as well. When defendant put his front private part in V.'s private part, A. and J. were always there. When they were sleeping in the back bedroom, they each had their own bed. Two twin beds were pushed together and the third was by the closet. These beds did not make noise when you moved in them. When V. would move to try to get away from defendant, her sisters never woke up.

At the time of the trial, Wendy was in the process of seeking a U visa, which had not been granted yet. Wendy denied that the facts in this case could make a difference in her petition for a visa.

V. had no knowledge of whether the allegations in this case would help her stay in the United States. She stated she did not know if there was a petition for her to stay in the United States, but expressed that she wanted to continue living here. V. did not know about Wendy's immigration status or whether Wendy had applied for a visa.

## II.    Defense Evidence

Ana C. had difficulty walking around due to pain and would use a walker, but she preferred to sit and lay down. She is on medication for pain and other health issues.

9.

Ana C. could not hear well and was blind until August 2019, when she had eye surgery. In 2016, Ana C. was living on Ivy Street with defendant, Wendy, and his girls A. and J., and slept in the front bedroom. V. arrived at the end of November or early December 2016. When Blanca arrived, Blanca slept in the room with A. and V. V. slept on the top bunk bed and Blanca slept on the bottom bunk. Ana C. moved out at the end of June 2017, four days after C. was born.

Ana C. recalled an incident during which she heard Blanca grab defendant, throw him against the wall and hit defendant because he dumped the coffee. Defendant left for work, but told Wendy he did not want Blanca living there anymore. Wendy said if Blanca was leaving, she was leaving too. When Wendy moved back to the Ivy house without Blanca, she did not want Ana C. there anymore either.

A. testified defendant was her father. A. never saw defendant touch her sisters J. or V. or her brother C. inappropriately. A. said she never woke up to noise or movement to find defendant hurting V. because when she sleeps, nothing wakes her up.

A. remembered talking with investigators in the fall of 2019. About a year after they stopped living with defendant, V. told A. that defendant raped her and that she had not wanted to tell A. because she was afraid A. was not going to believe her. A. told V. she believed her and, when they went back inside, V. told Blanca. Blanca called Wendy, who was at work. When Wendy got home, she called the police.

Defendant testified he did not rape, molest, or otherwise touch V. inappropriately. He remembered picking up V. from the airport in November 2016. The house on Ivy was small and V. slept on the bunk bed in the living room. V. slept on the top bunk and never slept on the couch. When Blanca arrived, she slept on the bottom bunk bed. Defendant is 5 feet 4 or 3 inches tall and the top of the bunk bed came to his mid-forehead. He did not think it was possible for him to yank V. out of the top bunk. He testified it was not possible for him to rape V. because it was a small house with several people living there. Defendant explained that you could hear everyone in the house, regardless of their

10.

location. When he was sleeping in the front bedroom, he could hear the girls talking in the back bedroom. It was an old house and when you moved, it made noise. Defendant stated that his voice is loud and you can always hear his voice.

Defendant would play with A., J., and V., but he never touched them inappropriately. Defendant would be alone with A. and J., but he was adamant he was never alone with V. because she was not his daughter. He testified he only touched V. in a normal, fatherly way. The last time defendant saw V. was March 1, 2018.

Defendant first spoke with police about the accusations September 19, 2019. Defendant was surprised when he learned about the allegations against him. According to defendant, Wendy confronted defendant with the allegations in front of V. and V. said, "'My grandma told me to say that.'" Defendant testified the claim that he sexually abused V. was part of Blanca's "manipulation." Defendant claimed that Blanca coached V. into saying that defendant touched her sexually, touched her on the chest, and pulled her by the legs. Blanca coached V. into saying that defendant took off V.'s clothes and put his private part in her private part. Defendant believed Wendy had to agree with Blanca, and A. had to follow through with the lies.

## III. Verdict and Sentencing

Defendant was charged with committing a lewd and lascivious act upon V., a child under 14 years of age, the first time (§ 288, subd. (a), count 1); committing a forcible lewd and lascivious act upon V., a child under 14 years of age, when he touched V. under her shirt (§ 288, subd. (b)(1), count 2); aggravated sexual assault, rape, upon V., who was under the age of 14 years old and was seven or more years younger than defendant, by means of force, violence, duress, menace or fear and accomplished by threatening to retaliate against the victim or other person, in her own bed in the girls' bedroom (§§ 269, subd. (a)(1), 261, subd. (a)(2), (a)(6), count 3); aggravated sexual assault, rape, upon V. who was under the age of 14 years old and seven or more years younger than defendant, by means of force, violence, duress, menace or fear, in her own bed after Wendy fell

11.

asleep (§§ 269, subd. (a)(1), 261, subd. (a)(2), count 4); and aggravated sexual assault, rape, upon V. who was under the age of 14 years old and was seven or more years younger than the defendant, by means of force, violence, duress, menace or fear and accomplished by threatening to retaliate against the victim or other person, the last time (§§ 269, subd. (a)(1), 261, subd. (a)(2), (a)(6), count 5). The following aggravating circumstances were also alleged: (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; (2) The victim was particularly vulnerable; (3) The manner in which the crime was carried out indicates planning, sophistication, or professionalism; and (4) The defendant took advantage of a position of trust or confidence to commit the offense.[3] (See Cal. Rules of Court, rules 4.408, 4.421.)

The jury found defendant guilty of all counts. The court sentenced defendant to an aggravated terms of 45 years to life, plus 14 years. The court imposed three consecutive 15-year-to-life terms for the three rape convictions in counts 3 through 5, plus eight years for count 2 and six years for count 1, to run consecutive to the term on count 2.

## DISCUSSION

### I.  The Trial Court Did Not Abuse Its Discretion in Excluding Expert Testimony Regarding the Nature of a U Visa

Defendant asserts the trial court abused its discretion and violated his right to present a defense by refusing his request to present expert testimony on the nature of a U visa. The People contend that the trial court properly exercised its discretion under Evidence Code section 352. We conclude the trial court did not abuse its discretion in excluding expert testimony regarding the U visa.

---

[3]    The court granted the prosecution's motion to dismiss the special allegations after the jury found defendant guilty on all counts.

### A. Relevant Factual and Procedural History

The People made a motion in limine to exclude evidence relating to immigration status or applications for visas by V. or Wendy. At a pretrial hearing, Wendy testified she came to the United Stated in 2008. In December 2018, Wendy applied for a U visa on the grounds that she was a victim of domestic violence from 2008 to 2017.[4] At the time of trial, Wendy's application for the U visa was still under review. Wendy had no intention of having V. apply for the same visa since V. was already going through a different process, having requested political asylum. Wendy had in her possession her visa paperwork, asylum documents for V., and the restraining order against defendant. After learning that an attorney was representing Wendy and V. in these other matters, the court did not allow the documents to be read or entered into evidence.

The court decided defense counsel could ask Wendy about the timeframe with respect to her U visa application and the reasons for applying for it. Defense counsel suggested they could stipulate that Wendy is applying for a visa that is granted to victims of crime and that V. came to the United States seeking asylum. The court did not see how Wendy's visa was "relevant to [V.] telling her grandmother that the defendant sexually assaulted her because you don't have Wendy in the mix there." Defense counsel argued Wendy is the one who called the police, but the court pointed out it was at the behest of the grandmother who just talked to V. The court stated, "I just don't see the nexus," but agreed to reserve ruling on the matter.

Before trial began, the prosecutor re-raised the asylum and visa issue. The court had not stated what its ruling was with respect to the immigration asylum and wanted to hear from the defense witnesses. Defense counsel suggested a stipulation on a description of a U visa. The court expressed its concern that this evidence will cause the

---

[4]  In March 2018, a domestic violence incident prompted Wendy to contact police and move out of the house with her children. Defendant grabbed Wendy by the hair while she was laying down asleep in the bedroom with A., J., V. and C.

jury to speculate about the visa and what is going to happen. Defense counsel suggested it could call its expert, Ana Moore, to testify about the U visa. The court responded, "That's why I wanted to keep it very limited because otherwise it's going to be … [¶] … [¶] … conjecture and speculation by the jury."

Defense counsel noted that Wendy is in the process of applying for a visa on the grounds of being victimized and it is an ongoing process that accumulates evidence and could include the evidence in this trial. Defendant argued that because this is an open application, familial victimization is relevant, and is the motive for the coaching of V. Defense counsel argued "It is essential to our defense. It is central to my client's right to defend himself and to cross-examine and confront the witnesses against him. We're not going to get into any of the details. I would just like the fact to go on the record that she is in the process of applying for [a U-]visa and that's it."

The court reminded defense counsel the admission of this evidence is subject to an Evidence Code section 352 analysis. And "the most pertinent portion of that defense is what does [Wendy] believe the [e]ffect of that [U-]visa will have? What does [Wendy] believe that these proceedings and the fact that she contacted police related to these proceedings, not to the domestic violence. I mean, the domestic violence is related because it's the defendant who allegedly perpetrated the domestic violence, but it's as it relates what is in her mind in terms of why she filed it, why she made application for both her and her daughter, and what she believes is going to happen with respect to these proceedings? [¶] Because that's the bias, motive and intent of her. That's the only relevance of it, and whether or not it's going to be granted or not granted, that's not relevant. What does she believe is going to happen?"

The court permitted defense counsel to ask Wendy what her intent was in applying for the visa. But the court held it was "not going to have an expert witness Ana Moore testify what [a U-]visa is because the jurors are just going to be spaced out." The court limited the testimony to "What did [Wendy] believe was going to happen as a result of

14.

applying for it? And when she applied for it, why she did it? And then also when she did it." "[W]hat was her state of mind when she applied for it and also her state of mind now." The court reiterated that "it's her state of mind, you know, the certain triggering events, so when she contacted the police when her mother told her [V.] had been [abused], and that any contacts that she had with the police, what did she believe that— what [e]ffect did she believe that would have on her immigration or her [U-]visa?"

The issue was revisited the following day. The court noted that Wendy's U visa application was based on the domestic violence incident that occurred on March 3, 2018, and the petition was not yet final. The court recognized that the defense "theory could be that [Wendy's] pursuing the U-visa to get revenge on the defendant." So the court ruled that "what would be admissible with respect to the U-visa would be the date that [Wendy] applied for the U-Visa, the status of the petition when the report to the police was made, and the current status of the petition. And then also her belief of the nexus between the granting or denial of the petition in this case and her assistance in this case and whether her assistance in this case will lead to the petition being granted." The court concluded that was what was relevant to the case and defense counsel agreed.

### B. Standard of Review and Applicable Law

A trial court's order is presumed correct and the defendant has the burden to demonstrate the court committed reversible error. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.) We review the trial court's decision whether to admit expert testimony for abuse of discretion. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

Except as otherwise provided by statute, all relevant evidence is admissible. (Evid. Code, §§ 350, 351.) "'Relevant evidence'" means evidence, including "evidence relevant to the credibility of a witness," having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (*Id.*, § 210.)

15.

"As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544.) A party may cross-examine a witness concerning motive and bias if relevant to prove a disputed material fact. (Evid. Code, §§ 210, 780, subd. (f); *Villa, supra*, 55 Cal.App.5th at p. 1050.) Although "'[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown, supra*, at p. 545.)

The right to cross-examine a witness on potential bias, prejudice, or ulterior motive is subject to restriction on the grounds stated in Evidence Code section 352. (*Villa, supra*, 55 Cal.App.5th at p. 1051.) That section "gives the trial court discretion to exclude evidence "'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352; accord, *People v. Lee* (2011) 51 Cal.4th 620, 643.) Such 'discretion extends to the admission or exclusion of expert testimony.'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) Trial courts have broad discretion to exclude such evidence to "'prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.'" (*People v. Ayala* (2000) 23 Cal.4th 225, 301; accord, *People v. Wheeler* (1992) 4 Cal.4th 284, 296; *Villa, supra*, at p. 1051.)

A reviewing court will uphold a trial court's exercise of discretion under Evidence Code section 352 unless "'it exercised its discretion in an arbitrary, capricious, or patently absurd manner.'" (*People v. Johnson* (2019) 8 Cal.5th 475, 521; *Villa, supra*, 55 Cal.App.5th at p. 1051; accord, *People v. Pearson, supra*, 56 Cal.4th at p. 443 [we review the trial court's decision whether to admit expert testimony for abuse of discretion];

16.

*People v. McDowell* (2012) 54 Cal.4th 395, 426 [trial court has broad discretion in deciding whether to admit or exclude expert testimony; reviewed for abuse of discretion]; *People v. Alcala* (1992) 4 Cal.4th 742, 788–789 [same].)

Any erroneous exclusion of evidence is generally evaluated under the *Watson* standard of prejudice. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. DeHoyos* (2013) 57 Cal.4th 79, 131.)

### C.    Analysis

Defendant argues that expert testimony of the U visa application process would have assisted the jury in determining whether Wendy's application for a visa gave her motive to encourage V. to falsely allege she was a victim of defendant's sexual abuse. Defendant argues the domestic violence incident alone may not have been enough to qualify for the U visa. Defendant claims that the jury had no way of knowing that Wendy and V. potentially stood to gain legal residency by falsely implicating defendant. Defendant argues an expert could have explained how Wendy and V. stood to gain from V.'s accusations against defendant. Defendant further contends the trial court's exclusion of such expert testimony violated his right to present a defense. The People disagree and respond that the trial court properly exercised its discretion under Evidence Code section 352, limiting the evidence regarding the U visa to Wendy's state of mind. The People also contend that even if the trial court abused its discretion, the exclusion of the proposed evidence did not prejudice defendant.

"In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.) A U visa provides visa status for someone who is a victim of certain crimes, including domestic violence and sexual abuse, and who is or is likely to be helpful to authorities investigating or prosecuting such criminal activity. (See 8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14 (2023); *Villa, supra*, 55 Cal.App.5th at pp. 1047, 1050.) In *Villa*, the

17.

defendant argued that he should be allowed to cross-examine the complaining witness regarding the circumstances behind her application for a U visa. (*Villa*, *supra*, at p. 1047.) The trial court found the evidence regarding her visa was "'relevant to show motive and/or bias and was relevant to [the victim's] credibility.'" (*Id*. at p. 1051.) The court also found the probative value of such evidence "was substantially outweighed by the risk of confusing the issues and consuming an undue amount of time." (*Id*. at p. 1052.) Accordingly, the trial court prohibited the defendant from asking the complaining witness about her U visa application. (*Ibid*.)

On review, the *Villa* court concluded the trial court did not abuse its discretion in excluding the visa application evidence under Evidence Code section 352. (*Villa, supra*, 55 Cal.App.5th at pp. 1052, 1054.) *Villa* agreed that the evidence had limited probative value based on (1) the fact that the victim's testimony following her discovery of the visa procedure "simply repeated what she said earlier" at the preliminary hearing, thereby leaving "very little reason to believe discovering she could obtain a U visa motivated her to testify falsely" and (2) "the physical evidence strongly supported the jury's finding that Doe was a victim of domestic abuse" given that she was found inside the defendant's vehicle with "several serious and obvious injuries." (*Id*. at pp. 1052–1053.) *Villa* also agreed there was a substantial risk of prejudice because (1) "the U visa evidence would have been unduly time consuming to present" since it would entail additional witnesses on the topic and "'take a huge chunk of time'"; (2) "the topic would have created a substantial risk of distracting and confusing the jury" by requiring an expert to educate them "on obtaining a U visa, the process of applying for one, the likelihood the visa would be approved, and the precise effect this would have had on Doe's immigration status"; and (3) the evidence would have "created at least some potential for prejudicing the jury against Doe" being "inclined to view her unfavorably if they found out she could use her standing as a victim of abuse to gain a path to legal immigration status." (*Id*. at p. 1053.) "All these complexities would likely have bogged the jury down in collateral

issues and presented it from focusing on the evidence of [the defendant's] conduct." (*Ibid*.) The *Villa* court further held, irrespective, exclusion of the evidence did not prejudice the defendant, since there was little reason to think the jury would have discredited Doe's testimony had it learned of the U visa application since Doe testified about the abuse consistently before she learned of the visa or applied for one and there was strong physical evidence of abuse. (*Id*. at p. 1054.)

Here as well, we cannot conclude the trial court abused its discretion in excluding the expert testimony under Evidence Code section 352. The trial court considered defendant's request to have an expert testify on the U visa process and carefully weighed the probative value of having an expert explain the visa against potential for undue prejudice. V. testified she was unaware of Wendy's application status or whether the result of this proceeding would have any effect of the outcome of Wendy's application for a visa. We agree with the trial court that evidence of Wendy's visa application process had little probative value on V.'s credibility. Wendy applied for a visa in December 2018, which was before V. said anything about defendant's sexual abuse in 2019. There is minimal probative value that the expert testimony would be relevant to show Wendy was motivated by the visa to get V. to make a false claim since V. did not disclose the sexual abuse to Wendy, but to A. first and then to Blanca. Wendy was only informed about the allegations after Blanca called her and told her to come home and call the police. Further, the trial court expressed its concern that the expert testimony would cause the jury to space out, and we agree that expert testimony on the U visa process would cause undue delay and invite "conjecture and speculation by the jury." (See *Villa, supra*, 55 Cal.App.5th at p. 1053 [testimony regarding the U visa would have been unduly time consuming to present and would have created a substantial risk of distracting and confusing the jury].) Thus, the trial court's decision to exclude expert testimony regarding the U visa was not made arbitrarily, capriciously, or in an absurd manner. (See *People v. Johnson* (2022) 12 Cal.5th 544, 610–611.) We cannot conclude the court

abused its discretion in excluding the expert testimony regarding the U visa. (See *Villa, supra*, at pp. 1053–1054.)

Even assuming error, defendant fails to demonstrate he was prejudiced by the trial court's decision to exclude expert testimony of the U visa. (See *Watson, supra*, 46 Cal.2d at p. 836; *People v. DeHoyos, supra*, 57 Cal.4th at p. 131.) First, the trial court allowed the defense to cross-examine Wendy regarding potential bias and motive for the visa. (See *People v. Brown, supra*, 31 Cal.4th at p. 545 [the trial court may impose reasonable limits on defense counsel's ability to test credibility of a witness based on concerns about confusion of the issues or relevance].) Counsel was permitted to ask questions such as "What did [Wendy] believe was going to happen as a result of applying for [the U visa]? And when she applied for it, why she did it? And then also when she did it." "[W]hat was her state of mind when she applied for it and also her state of mind now." The court reiterated that "it's [Wendy's] state of mind, you know, the certain triggering events, so when she contacted the police when her mother told her [V.] had been [abused], and that any contacts that she had with the police, what did she believe that—what [e]ffect did she believe that would have on her immigration or her [U]-visa?" By allowing this portion of evidence regarding Wendy's visa application, it allowed the jury to be made aware of any potential for motive and bias. (See *Villa, supra*, 55 Cal.App.5th at p. 1051 [evidence "'relevant to show motive and/or bias and was relevant to her credibility'"].)

Even if the jury had heard expert testimony on the U visa application process and learned that additional evidence could be added to the application, defendant has not demonstrated it was reasonably probable he would have obtained a more favorable outcome. (See *Watson, supra*, 46 Cal.2d at p. 837.) The evidence shows V. did not know about Wendy's visa application and there was no evidence V. told Wendy about the sexual abuse first. Wendy was at work and only found out about the abuse when Blanca called to tell her. Even if expert testimony on the U visa process was admitted, it

would not change this evidence. Nor does it make it reasonably probable that the jury would have disregarded the victim and chosen to accept the unsupported defense theory that Wendy manipulated V. to lie in detail about numerous detailed instances of sexual abuse. Therefore, we cannot conclude the trial court abused its discretion by excluding expert testimony on the U visa or that defendant was prejudiced as a result of the exclusion of such evidence.

## II. Defendant Fails to Demonstrate He Received IAC at Trial Regarding A.'s Testimony

Defendant asserts that his counsel was prejudicially ineffective for (1) eliciting testimony from A. that defendant physically abused her, and (2) not objecting to the prosecutor's cross-examination of A. on the subject. The People disagree, contending defendant failed to show there was no tactical reason for his counsel's actions. The People also argue the evidence was not entirely harmful to defendant, since the trial court told the jury to disregard the evidence, and it tended to show that A. had reason to be biased against defendant, but still testified she never saw defendant sexually abuse V. We conclude defendant failed to demonstrate he was prejudiced by any alleged deficiencies in his counsel's representation.

### A. Relevant Procedural History

Defense counsel called A., defendant's daughter, as a witness. On direct examination of A., defense counsel asked A. "has [defendant] ever hurt you?" to which she responded "Yeah." Counsel asked A. "In terms of what he did to your sister?" and A. responded "Yeah, and he was abusive." Counsel followed up with the specific question "has he ever touched you sexually?" and A. responded "No." Through further questioning, A. clarified that defendant never touched her vagina or her chest and that she never saw defendant touch either of her sisters or brother inappropriately. Defense counsel then said to A., "you said your dad was physically abusive with you?" and asked

21.

her "What did he do?"  A. answered "Well, once he hit me hard.  He made my nose bleed."  She said it did not make her angry, it made her "sad and a little scared of him."

On cross-examination, the following colloquy occurred:

"[PROSECUTOR:]  One thing, first you said that your dad hit you once?

"A.  Yeah, multiple times actually.

"[PROSECUTOR:]  Was there anyone else there?

"A.  My mom would know about it but obviously wouldn't do anything because she was afraid of him.

"[PROSECUTOR:]  Did you ever tell [V.] what he did to you?

"A.  Everyone knew.

"PROSECUTOR:]  Everyone knew?  [¶]  What grade are you in right now?

"A.  I'm in 8th.

"[PROSECUTOR:]  Does that make you 13 years old now?

"A.  Yeah.

"[PROSECUTOR:]  Do you remember what grade you were in when your dad hit you?

"A.  It would be like every single—like from all the time, like it stopped in 4th grade because that's when we moved away.  We moved from the house.

"[PROSECUTOR:]  I'm just asking about the time you got that bloody nose. Do you remember what grade you were in?

"A.  I think I was in third, second.

"[PROSECUTOR:]  Would you have been around seven or eight years old?

"A.  Yeah."

At this point, the trial court interrupted proceedings and called the attorneys to the bench. The court asked the defense attorney why he had not objected yet and whether she had a strategy for not objecting. Defense counsel explained she did not object because she believed she opened the door, but that she was going to start objecting because the questioning went beyond what she asked about. Defense counsel also explained that when she asked A. if she had been abused, she "meant it to be sexually abused." When they returned to proceedings before the jury, defense counsel made an objection to the line of questioning based on Evidence Code section 352 and the court reserved its ruling.

After completing A.'s testimony, the court took a break and returned to the issue of A.'s statements outside the presence of the jury. The court restated for the record that since it did not hear an objection from defense counsel, it paused the proceedings because it did not know where counsel was going with the line of questions. The court explained that the domestic violence evidence with Wendy was admitted only for the limited purpose regarding her immigration petition. Defense counsel asked the court to strike A.'s statements. The court responded that "strategically we certainly can strike that. I can give a jury instruction. You know, we always instruct the jurors to try to unring the bell, if the bell's been rung, so I guess my question to you, if you want it stricken with respect to [A.?]" Defense counsel continued with her motion to strike and requested mitigating instructions. The court decided to strike all of A.'s testimony related to defendant's physical abuse.

The prosecution requested that the testimony that came out on direct examination remain in since it was from defense counsel's questioning. Defense counsel explained that she did not understand the court's ruling regarding the domestic violence evidence with Wendy and said that if she had she would not have brought this evidence in. The court decided that "Any testimony from [A.] about physical abuse by her father towards her should be stricken, and the jury should be told to completely disregard it. It's not—

'it's not relevant. It's not relevant to the charges." The court stated, "my ruling would be during [A.]'s testimony I reserved a ruling on an objection made by the defense. My ruling relates to any testimony—my ruling is as follows: [¶] It relates to any testimony given by [A.] about physical abuse on her by her father. That testimony is stricken from the record and the jury is to disregard it."

At the close of trial, the court instructed the jury as follows: "any testimony given by [A.] about physical abuse on her by her father, the defendant …. The testimony is stricken from the record and may not be considered for any purpose. The jury is ordered to disregard it."

During deliberations, the jury asked for readback of A.'s entire testimony. The trial court redacted the testimony regarding the physical abuse against A. in the testimony read back to the jury.

## B. Standard of Review and Applicable Law

The Sixth Amendment of the federal Constitution and article I, section 15 of the California Constitution guarantee the right to the assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.) The *Strickland* court established a two-prong test requiring the defendant to demonstrate deficient performance as well as prejudice. The standard is the same under the federal and state Constitutions. (*Ibid.*; *People v. Osband* (1996) 13 Cal.4th 622, 700.) The first part of this test requires a showing by a preponderance of the evidence that the defense attorney failed to act in accordance with an objective standard of reasonableness. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126; *People v. Bolin* (1998) 18 Cal.4th 297, 333 (*Bolin*) [trial counsel's performance fell below an objective standard of reasonableness]; *People v. Yates* (2018) 25 Cal.App.5th 474, 487–488.) It is sufficient if the defendant can show that defense counsel's omissions involved a crucial issue with no reasonable explanation for counsel's inaction. (*People v. Jackson* (1980) 28 Cal.3d 264, 289, overruled on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3; *People v. Scott* (1997) 15 Cal.4th 1188, 1212 (*Scott*)

24.

[there can be no reasonable explanation]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [same].)

Review of trial counsel's performance "must be highly deferential" and include a "strong presumption" that the defendant received reasonable professional assistance of counsel. (*Strickland v. Washington, supra*, 466 U.S. at p. 689.) The alleged deficiency must also be assessed "'under the circumstances as they stood at the time that counsel acted or failed to act.'" (*Scott, supra*, 15 Cal.4th at p. 1212.) "Although deference is not abdication [citation], courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*Ibid.*; accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 217 (*Ledesma*).)

In resolving claims of IAC, "'we must "assess counsel's overall performance throughout the case" [citation], evaluating it "from counsel's perspective at the time of the alleged error and in light of all the circumstances. [Citation.]"'" (*Bolin, supra*, 18 Cal.4th at p. 335; accord, *Strickland v. Washington, supra*, 466 U.S. at p. 690 [viewed at the time of counsel's conduct]; *Kimmelman v. Morrison* (1986) 477 U.S. 365, 384, 386.) "Merely tactical errors by counsel are not deemed reversible [citations], for the decisions of counsel in the midst of trial cannot be second-guessed by the hindsight of an appellate court [citation]." (*People v. Frausto* (1982) 135 Cal.App.3d 129, 139.)

The failure to object is a matter that usually involves tactical decisions on counsel's part and seldom establishes counsel's incompetence. (*People v. Frank* (1990) 51 Cal.3d 718, 736; *People v. Jackson, supra*, 28 Cal.3d at pp. 291–292; *People v. Frierson* (1979) 25 Cal.3d 142, 158.) It cannot be said that counsel was ineffective if there was a plausible tactical reason for the failure to object. (*People v. Sapp* (2003) 31 Cal.4th 240, 277 [no IAC where "counsel's choice to forgo any objection may have been tactical"]; *People v. Jones* (2003) 29 Cal.4th 1229, 1254 ["'where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find

[IAC] on appeal unless there could be no conceivable reason for counsel's acts or omissions'"].)

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra*, 466 U.S. at p. 694; accord, *People v. Rodrigues, supra*, 8 Cal.4th at p. 1126; *People v. Lewis* (1990) 50 Cal.3d 262, 288 ["it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings"].) "[T]here is no reason for a court deciding an [IAC] claim to approach the inquiry in the same order [set forth above] or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington, supra*, at p. 697.)

### C.    Analysis

First, defendant contends that his counsel was ineffective by eliciting information from A. that defendant physically abused her by posing the open-ended question whether defendant ever hurt her. Second, he asserts his counsel was ineffective in failing to object to the prosecutor's cross-examination of A., which allowed the jury to learn that defendant was abusive not just once, but on multiple occasions, and that it only stopped when A. moved out. The People disagree, arguing defendant fails to demonstrate that trial counsel was ineffective. Regardless, the People contend defendant fails to demonstrate he was prejudiced by any alleged error by counsel.

### 1.    Defense Counsel's Direct Examination of A., Eliciting Testimony Defendant Physically Abused Her

Defendant claims he received IAC when his defense attorney solicited damaging testimony from A. that defendant physically abused her by hitting her and giving her a

bloody nose and that it made her sad and scared of defendant. The People claim defendant cannot show counsel had no reasonable tactical reason for proceeding as she did, nor can defendant demonstrate he was prejudiced.

We begin by considering the facts in *People v. McDermott* (2002) 28 Cal.4th 946, as guidance in this case. The defendant claimed his trial counsel improperly asked Gary Venturini, the murder victim's former lover, if Venturini's relationship with another former lover was physical, which improperly elicited testimony that the other former lover had died of AIDS. (*Id*. at p. 995.) After the prosecution objected, defense counsel rephrased the question to delete any reference to the relationship being physical. (*Ibid*.) The court decided defense counsel could not have anticipated the testimony the defendant claimed was offensive, that Venturini's former lover had died of AIDS, because that statement was not responsive to defense counsel's question, which made no reference to the death of the former lover. (*Id*. at pp. 995–996.) The court concluded the defendant failed to show incompetent representation at trial. (*Id*. at p. 996.)

Similarly here, A. was called as a witness by the defense to testify that her father had never sexually abused her. Under the circumstances of the case, at the time counsel asked A. whether her father ever hurt her, it is reasonable to believe that counsel did not anticipate A. would answer yes. (See *Scott, supra*, 15 Cal.4th at p. 1212 [deficiency must also be assessed "'under the circumstances as they stood at the time that counsel acted or failed to act'"].) The record also includes defense counsel's explanation that she meant sexual abuse when she asked if defendant ever hurt A., expecting A. to answer no. Although we agree the question was poorly posed and vague, it does not necessarily demonstrate counsel's performance fell "below an objective standard of reasonableness." (See *Bolin, supra*, 18 Cal.4th at p. 333.)

We disagree with defendant that the facts of this case are more like *In re Jones* (1996) 13 Cal.4th 552. In *In re Jones*, defense counsel made a conscious, strategic decision to ask a witness to name the person her mother identified as the murderer of

27.

Janet, the victim. (*Id*. at p. 570.) Defense counsel failed to indicate whether he interviewed the witness before trial to determine what her answer would be and must have failed to read the police report, which showed the witness telling the police her mother identified the defendant as the murderer. (*Ibid*.) The court also noted counsel posed his question in a manner that made it unlikely the witness would identify someone else. (*Ibid*.) Thus, the court concluded defense counsel's question fell below the standard of a reasonable competent attorney. (*Ibid*.) Here, although defense counsel asked an open-ended question, there is no evidence in the record that counsel could have known A. would answer that defendant had hurt her. Defense counsel called A. as a witness for the purpose of testifying that defendant never sexually assaulted her. It is apparent from the record that counsel did not anticipate A. would say that defendant physically abused her.

In further support of his position, defendant cites several federal cases that may be persuasive but are not binding on this court. (See *People v. Cleveland* (2001) 25 Cal.4th 466, 480 [California courts are not bound by lower federal courts, even on federal questions]; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [not bound by federal courts]; *People v. C.S.A.* (2010) 181 Cal.App.4th 773, 777 [federal circuit cases persuasive].) In *United States v. Villalpando* (8th Cir. 2001) 259 F.3d 934, trial counsel elicited testimony from a witness tending to establish the defendant's character as threatening and murderous. (*Id*. at p. 939.) The court agreed that, under the circumstances of the drug-related prosecution, such evidence had absolutely no strategic value for the defendant and was prejudicial to the outcome of his case. (*Ibid*.) The court, applying an abuse of discretion standard of review, affirmed the IAC conclusion. (*Ibid*.) However, abuse of discretion is not the applicable standard of review here. (See *People v. Yates, supra*, 25 Cal.App.5th at pp. 487–488 [burden on the defendant to demonstrate IAC by a preponderance of the evidence].)

28.

In *Glancy v. State* (Fla.Dist.Ct.App. 2006) 941 So.2d 1201, defense counsel was found to render IAC for asking the victim of the residential burglary why she did not like the defendant, which elicited testimony that the defendant had given her 14-year-old son pot, booze, and cigarettes. (*Id.* at p. 1203.) Counsel then asked the victim's son why his mother did not like the defendant and he said it was because the defendant had been in and out of prison. (*Ibid.*) The court found that because counsel repeated this type of questioning on two witnesses and took no action to alleviate the damage, counsel's representation fell outside the wide range of professionally competent assistance. (*Ibid.*) Here, however, defense counsel did not repeat the line of questioning with another witness. Rather, once A. answered that defendant hurt her, defense counsel worked to recover from A.'s answer to demonstrate defendant did not sexually abuse her. Defense counsel later objected to the testimony and moved to strike all reference to defendant's physical abuse of A. Therefore, the *Glancy* case is distinguishable.

Defendant's reliance on *Chatmon v. United States* (D.C. 2002) 801 A.2d 92 is also misplaced. In *Chatmon*, defense counsel's questions led to the introduction of the defendant's identification from evidence that was otherwise inadmissible. (*Id.* at p. 109.) The court noted that defense counsel knew that questioning this witness could have elicited a response about the identification, yet he did it anyway. (*Ibid.*) The court found IAC and a reasonable probability the jury would have had a reasonable doubt as to the defendant's guilt absent the evidence. (*Id.* at pp. 111–112.) Here, there was no evidence in the record that defense counsel knew A. would testify that defendant physically abused her. Rather, defense counsel's question was meant to get A. to respond that defendant never sexually abused her.

Additionally, defendant fails to demonstrate his trial counsel's decision to ask A. follow-up questions about what defendant did to hurt her was an unreasonable tactical decision. (See *Scott, supra*, 15 Cal.4th at p. 1212.) Once A. stated that defendant hurt her, defense counsel could not ignore that answer since defendant was facing charges of

sexual abuse. Defense counsel's follow-up questions allowed A. to clarify that defendant did not sexually abuse her and that she never saw defendant sexually abuse V. or her siblings. A.'s answer that defendant hit her hard and made her nose bleed was bad character evidence, but it cannot be said there was no reasonable or sound tactical strategy in asking A. additional questions in order for her to explain what she meant when she said defendant had hurt her.

On this record, and giving deference to trial counsel, defendant fails to demonstrate by a preponderance of the evidence that trial counsel's performance fell "below an objective standard of reasonableness" in her direct examination of A. (See *Strickland v. Washington, supra*, 466 U.S. at p. 688; see also *Bolin, supra*, 18 Cal.4th at p. 333.)

**2. Defense Counsel Failed to Object to the Prosecutor's Cross-examination of A., Which Allowed the Jury to Learn Defendant Was Abusive on Multiple Occasions and Only Stopped When A. Moved Out**

Defendant also claims his counsel was ineffective when she failed to object to the prosecutor's questioning of A., which produced testimony that defendant hit her multiple times, that her mother was scared of defendant, and that the physical abuse did not stop until they moved out. Defendant argues his counsel did not have a tactical purpose for failing to object and admitted on the record she did not believe she had a legitimate basis to object since she opened the door to the line of questioning. The People argue defendant fails to demonstrate defense counsel did not have a reasonable tactical strategy for not objecting to the questioning of A. about defendant hitting her. Counsel could have determined she opened the door to the line of questioning or did not want to risk painting a negative impression with the jury by objecting to the evidence she herself raised.

"Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to

30.

object seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621; see *People v. Williams* (1997) 16 Cal.4th 153, 215.) "In order to prevail on [an IAC] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." (*People v. Ray* (1996) 13 Cal.4th 313, 349; accord, *Williams, supra*, at p. 215.) However, in some cases, defense counsel's decisions "may be so ill chosen that they may render counsel's overall representation constitutionally defective." (*United States v. Tucker* (9th Cir. 1983) 716 F.2d 576, 586; see *Martin v. Rose* (6th Cir. 1984) 744 F.2d 1245, 1249 [stating that "even deliberate trial tactics may constitute [IAC] if they fall 'outside the wide range of professionally competent assistance'"].) The question is "whether any reasonably competent counsel would have done as counsel did." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

In *People v. Robertson* (1982) 33 Cal.3d 21, 41 (*Robertson*), the defense attorney explained he did not object to the defendant's admission of two other murders "'because there was no basis for objection.'" However, the court concluded the defense attorney was wrong and the testimony was objectionable on the ground that no independent evidence of the corpus delicti of those crimes were introduced. (*Ibid.*) It was also objectionable under Evidence Code section 352 as the obvious potential for prejudice that the jury would consider the defendant's statement as proof that he killed two other women. (*Robertson, supra*, at p. 42.) Similarly here, defense counsel was not precluded from objecting to potentially irrelevant or prejudicial evidence. (See *id.* at pp. 41–42.)

Here, the record contains defense counsel's expressed reasons for her decision not to initially object to the prosecutor's questioning of A. Defense counsel believed that she had opened up the line of questioning regarding physical abuse due to her direct examination of A. Counsel also disclosed she believed the testimony was relevant as related to the court's ruling that Wendy was allowed to testify that defendant had been physically abusive of her as to her reason for applying for a U visa. After the court asked the attorneys to approach the bench and questioned defense counsel about why she was

not objecting, defense counsel said she was going to object to any additional questions on the matter as going beyond the scope of her direct examination. Defense counsel did end up objecting to A.'s testimony that defendant was physically abusive to A. and successfully moved to strike that portion of her testimony from the record.

We need not decide whether trial counsel's strategy here was deficient since defendant has failed to show that the challenged actions of counsel were prejudicial, as discussed below. (See *People v. Weaver* (2001) 26 Cal.4th 876, 961 (*Weaver*) [reviewing court may reject an IAC claim on lack of prejudice without determining whether counsel's performance was deficient].)

### 3. Defendant Fails to Demonstrate Prejudice Resulted From Trial Counsel's Direct Examination of A. or Her Failure to Object

Defendant argues evidence of irrelevant prior violence is inherently prejudicial and would tend to cause the jury to conclude defendant is an abusive man. Defendant contends the testimony regarding his prior abuse of A. was particularly inflammatory. Defendant also argues this was a close case as evidenced by the jury's request for readback of A.'s testimony and no evidence corroborating V.'s allegations despite the fact V.'s sisters slept in the same room. The People argue defendant cannot establish prejudice since the court instructed the jury to disregard the evidence and the testimony of physical abuse was not more harmful than the allegations of sexual abuse. Moreover, the jury had already heard testimony from other witnesses that defendant had been physically abusive. Defendant contends A.'s testimony regarding the physical abuse was so prejudicial "it is probable that the information at least unconsciously affected their verdicts" and had the probable effect of convincing the jurors that he must have sexually abused V. as well.

In *Robertson*, as discussed above, defense counsel failed to object to the defendant's admission to committing two other murders, while facing charges of murder and sexual assault. Counsel explained he did not object to the defendant's admission

because he believed "'there was no basis for objection.'" (*Robertson, supra*, 33 Cal.3d at p. 41.) The court concluded the IAC claim failed for lack of prejudice. (*Id*. at p. 42.) Although the admissions were not minimal or insignificant, the court concluded the evidence was so overwhelming as to guilt that it was not reasonably probable the trial counsel's errors affected the jury's determination on guilt. (*Ibid*.) Here as well, the evidence strongly supports defendant's guilt. V.'s testimony was consistent with what she told police and details of her testimony, such as where she slept, who she shared a room with, and when Wendy was in the hospital, were corroborated by other witnesses.

In *Weaver*, the defendant claimed his attorney was constitutionally ineffective for failing to object to two experts whose testimony was later deemed inadmissible. (*Weaver, supra*, 26 Cal.4th at pp. 960–961.) The court concluded the defendant failed to demonstrate prejudice since the experts' opinion that the defendant was not insane was not as inflammatory or negative as the defendant claimed it to be since other expert witnesses also expressed the opinion that the defendant was not insane. (*Id*. at p. 961.) Here as well, A.'s testimony about the physical abuse was not as inflammatory when balanced against the evidence in the case. Evidence of defendant's physical abuse was already admitted at trial. V. testified defendant threw the warm tortilla at her face and she believed they moved out of the Ivy house because defendant hit Wendy. V. testified defendant threatened to kill her mother and hurt her siblings. Wendy believed defendant intended to hit Blanca and she applied for a U visa based on domestic violence from defendant. Therefore, A.'s statements that defendant hit her multiple times were not out of line with evidence already admitted at trial and less likely to have been a shock or unduly inflammatory under these circumstances.

After A. answered that defendant hurt her, defense counsel's follow-up questions helped minimize any potential confusion by having A. explain that defendant did not sexually abuse her. We consider that evidence of physical abuse is less inflammatory than evidence of sexual abuse. A. was clear that she did not suffer sexual abuse from

defendant, nor did she see him commit any such abuse on V. or her siblings. The fact that A. testified defendant physically hurt her shows her willingness to be completely honest, which adds to her credibility that defendant did not sexually abuse her. As such, A. likely provided strong testimony for the defense's theory that the sexual abuse did not occur and was impossible under the circumstances of the case.

Additionally, the trial court struck all testimony from the record relating to defendant physically abusing A. and instructed the jury to disregard the evidence in its entirety. The jury is presumed to follow the court's admonition. (See *People v. Leavel* (2012) 203 Cal.App.4th 823, 831.) Accordingly, we conclude it is not reasonably probable the jury would have reached a different verdict if defense counsel had objected to this evidence. (See *Strickland v. Washington, supra*, 466 U.S. at p. 694.)

We disagree with defendant that A.'s statements prejudiced defendant because the jury's request for readback of A.'s entire testimony indicated this was a close case. "[T]he fact that the jury requested readback of testimony [does not] establish[] that his case was close .…" (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1075.) This is not a case with mixed verdicts, which may indicate this was a close case. (See *People v. Epps* (1981) 122 Cal.App.3d 691, 698.) Rather, the jury found defendant guilty of all the charges.

We also disagree with defendant's reliance on *People v. Alcala* (1984) 36 Cal.3d 604, 631 (*Alcala*), superseded by Evidence Code section 1108 as stated in *People v. Falsetta (*1999) 21 Cal.4th 903, 911, and *People v. Thompson* (1988) 45 Cal.3d 86, 109 (*Thompson*) to argue that evidence of prior bad acts is especially prejudicial. Defendant cites to *Alcala* to argue propensity evidence "'give[s] excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.'" (*Alcala, supra*, at p. 631.) In *Alcala*, the issue was the identity of the victim's abductor and killer. The prosecution argued evidence of the defendant's prior

crimes was admissible on that issue due to the similarity of his earlier offenses to the current ones, strongly suggesting the same person committed them all.  The Supreme Court disagreed and found the evidence did not establish intent, pattern or scheme and was therefore admitted in error, and the error was prejudicial because, under the circumstances, "the jury may well have been influenced by improper consideration of the other crimes, which were highly prejudicial in their nature, in deciding that [the] defendant was the" perpetrator.  (*Id.* at pp. 632–636.)  *Alcala* is distinguished from our case in that defendant's prior uncharged acts of hitting A. were not similar acts to V.'s allegations of sexual abuse and were not admitted as pattern evidence to establish identity.

In *Thompson*, the trial court allowed evidence that the defendant indicated he would "kill anyone who got in the way of his plan."  (*Thompson, supra*, 45 Cal.3d at p. 109.)  Even though the evidence had the potential to portray the defendant as a dangerous person more likely to commit his charged offense of first degree murder and rape, this evidence was admissible to show motive and his state of mind since the prosecution's theory was that the defendant raped and then killed the victim to prevent her from reporting the rape and possibly interfering with his plans.  (*Id.* at pp. 109–110.)  The court concluded that even assuming error, it was not reasonably probable that a different result would have occurred absent the evidence.  (*Id.* at p. 111.)  The *Thompson* case is distinguishable in that the defendant challenged the court's admission of prior uncharged acts, which were upheld as proper to show motive.  Here, A.'s statements were not admitted by the court for evidentiary purposes.  Defense counsel objected to the statements, which were stricken from the record.  Like in *Thompson*, as discussed above, defendant fails to meet his burden of demonstrating it is reasonably probable that a different result would have occurred absent the evidence.  (See *People v. Wash* (1993) 6 Cal.4th 215, 271.)  Accordingly, defendant's claim of IAC fails.

**III. The Court Was Required to Impose Full, Consecutive Sentences Under Section 667.6, Subdivision (d), But Erred in Designating the Principal Term**

Defendant contends the court was without authority to impose full-term consecutive sentences for counts 1 and 2 under section 667.6, subdivisions (c) or (d). The People disagree, contending the consecutive terms were authorized by section 667.6, subdivision (d). We conclude the court was required to impose full, consecutive sentences under section 667.6, subdivision (b), but that it erred in designating count 2 as the principal term.

**A. Relevant Factual Background**

During the sentencing hearing, the trial court stated that count 2, a violation of section 288, subdivision (b), is "an offense for which fully consecutive sentences can be imposed by the Court pursuant to 667.6[, subdivision ](c)." The court gave its tentative intent to impose the midterm of eight years for count 2 and a fully consecutive term of six years on count 1. The court noted that section 288, subdivision (a) (count 1) was not listed in subdivision (e) of section 667.6, but stated, "I do believe the code says shall; a full, separate and consecutive term shall be imposed for each violation of an offense specified in [section 667.6,] subdivision (e). And I believe the Court is mandated to do so. If the Court is not mandated to do so and I have the discretion to do so, I certainly would exercise my discretion in this case to impose six years consecutive, and the six years will be the mid term on Count 1." The court also stated its intent to impose fully consecutive indeterminate terms on counts 3, 4, and 5. Defense counsel asked that the indeterminate terms be sentenced concurrently "to the extent that it is allowed" based on defendant's "negligible" prior criminal history. The prosecution asserted the Court had discretion to impose a fully consecutive term on the section 288, subdivision (a) violation. Regarding counts 3, 4, and 5, the prosecutor asserted the court was required to impose consecutive terms, and, even if the court was not bound to impose consecutive terms, it should do so based on the seriousness of each offense.

After counsel submitted, the court commented on the credible nature of defendant's threats toward V. that made her very vulnerable, his infliction of physical and emotional injury to V., the criminal sophistication exhibited by the crimes, his minimal criminal history, the significant impact incarceration would have on defendant, and defendant's apparent lack of remorse. The trial court stated each crime was separate and distinct, and it intended to impose consecutive sentences. The court stated it would impose the aggravated terms on counts 1 and 2 if it had the power to do so. The court again stated it was imposing fully consecutive terms.

### B. Applicable Law

Section 667.6, subdivision (c) states that "a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion. A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e).…"

Section 667.6, subdivision (d)(1)–(3) states that "(1) A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions. [¶] (2) In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions. [¶] (3) The term shall be served consecutively to any other term of imprisonment and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination

37.

pursuant to Section 1170.1. Any other term imposed subsequent to that term shall not be merged therein but shall commence at the time the person otherwise would have been released from prison."

Section 667.6, subdivision (e)(1)–(5) states that "This section shall apply to the following offenses: [¶] (1) Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261. [¶] (2) Rape, in violation of paragraph (1), (4), or (5) of subdivision (a) of former Section 262. [¶] (3) Rape or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 286. [¶] (5) Lewd or lascivious act, in violation of subdivision (b) of Section 288."

### C. Analysis

Defendant contends the court was without authority to impose full-term, consecutive sentences for counts 1 and 2 under section 667.6, subdivisions (c) or (d). Defendant contends that because count 1 and count 2 were not committed on the same occasion, they are ineligible for full-term consecutive sentencing under section 667.6, subdivision (c). Defendant also contends that he was ineligible for full-term consecutive sentencing under section 667.6, subdivision (d) because he was not convicted of two or more offenses listed under subdivision (e) of section 667.6. Defendant concedes that a section 288, subdivision (b) conviction is listed under subdivision (e) of section 667.6, but asserts that he cannot be sentenced under subdivision (d) of section 667.6 because his section 288, subdivision (a) conviction is not listed under subdivision (e) of section 667.6 and his section 269 convictions were not part of defendant's determinate sentence. The People disagree, arguing the full-term, consecutive sentences were authorized and mandated under section 667.6, subdivision (d).

We agree that section 667.6, subdivision (c) does not apply to counts 1 and 2 since the crimes did not involve the same victim on the same occasion. (See *People v. Goodliffe* (2009) 177 Cal.App.4th 723, 732.) Count 1, the lewd act upon a child in

38.

violation of section 288, subdivision (a), was for the first incident, which occurred when defendant touched V.'s chest when she had gotten up in the middle of the night to get water and happened sometime in 2016. Count 2, forcible lewd act upon a child in violation of section 288, subdivision (b)(1), was for touching V. under her shirt, which happened when Wendy was in the hospital in 2017 and defendant used threats to kill Wendy in order to get V. to let him touch her chest under her shirt. Although these crimes are against the same victim, they occurred on separate occasions and fall outside subdivision (c) of section 667.6.

Next, we reject defendant's argument that he is ineligible for full-term, consecutive sentencing under section 667.6, subdivision (d) because he was not convicted of two or more offenses listed under subdivision (e) of section 667.6. Subdivision (d) of section 667.6 mandates full, separate, and consecutive sentencing since defendant was convicted of multiple offenses listed under subdivision (e) of section 667.6 against the same victim, V., on separate occasions. The Supreme Court explained that the original language of section 667.6, subdivision (d) "'if *such crimes* involve separate victims or involve the same victim on separate occasions,'" indicates that the Legislature intended the word "'crimes'" in that provision to refer back to the immediately preceding list of enumerated sex offenses. (*People v. Jones* (1988) 46 Cal.3d 585, 595–596 (*Jones*).) "In this way the Legislature indicated that subdivision (d), the mandatory consecutive sentencing provision, was intended to cover only the multiple [enumerated sex offense] situation." (*Ibid.*; accord, *People v. Rojas* (1988) 205 Cal.App.3d 795, 799.) Defendant was convicted of multiple sex offenses listed under section 667.6, subdivision (e): one count of section 288, subdivision (b) and three counts of section 269, which are included in subdivision (e) of section 667.6 under section 261, subdivision (a). (§ 667.6, subd (e)(1), (e)(5).)

According to defendant, only the section 288, subdivision (b) conviction counts under subdivision (e) of section 667.6 because the section 269 convictions were subject

39.

to indeterminate sentencing. We reject defendant's argument as unpersuasive and unsupported. There are numerous cases where appellate courts have applied full, consecutive sentences under section 667.6, subdivision (d) based on convictions listed in subdivision (e) of section 667.6 with indeterminate terms. (See *People v. Figueroa* (2008) 162 Cal.App.4th 95, 99 (*Figueroa*); *People v. Jones* (2001) 25 Cal.4th 98, 102–103 [the defendant was sentenced to three consecutive terms of 25 years to life pursuant to § 667.61, subds. (a), (c), and (d)(2), plus full, separate and consecutive terms on the same counts pursuant to § 667.6, subd. (d)]; *People v. Glass* (2004) 114 Cal.App.4th 1032, 1037 (*Glass*) [§ 269 offenses are subject to sentencing requirements of § 667.6]; *People v. Jimenez* (2000) 80 Cal.App.4th 286, 291–292 [mandatory consecutive sentencing provision of § 667.6, subd. (d) applied to § 269 convictions].)

Our court observed in *Glass* that when a person is convicted of multiple forcible sex offenses against the same victim on different occasions, the court is required to sentence the defendant to full-term consecutive sentences under section 667.6, subdivision (d). "'Under [section 269], as it might interact with … section 667.6, a person convicted of six counts of child molestation, could receive … six consecutive life sentences.'" (*Glass, supra*, 114 Cal.App.4th at p. 1037, fn. 10; accord, *Figueroa, supra*, 162 Cal.App.4th at p. 99.) Additionally, in *People v. Maharaj* (2012) 204 Cal.App.4th 641 (*Maharaj*), the defendant was convicted of three counts of section 269, subdivision (a) and one count of section 288, subdivision (b). (*Maharaj, supra*, at p. 649.) The *Maharaj* court concluded each of the defendant's section 269 offenses were included in section 667.6, subdivision (e) and section 667.6, subdivision (d) required full separate consecutive sentences for his four convictions. (*Maharaj, supra*, at p. 650.) Here as well, defendant was convicted of three counts of section 269, subdivision (a)(1) and one count of section 288, subdivision (b)(1). Therefore, the court was required to impose full and separate consecutive sentences under section 667.6, subdivision (d).

Without any authority in support of his position, defendant claims *Maharaj* was wrongly decided and argues the section 269 convictions cannot be used under section 667.6, subdivision (d) because they are subject to indeterminate sentencing. Defendant is wrong. The same issue was raised by the defendant in *Figueroa*, who "point[ed] out that the terms addressed in section 667.6, subdivision (d) are determinate, while the ones provided in section 269, for the same crimes against children, are 15 years to life." (*Figueroa, supra*, 162 Cal.App.4th at p. 99.) The court rejected this argument and upheld *Glass*. (*Figueroa, supra*, at p. 99.) So do we. As the Supreme Court in *Jones* explained, section 667.6, subdivision (d) is not a sentencing alternative, but constitutes a mandatory consecutive sentencing scheme applicable when a defendant has been convicted of two or more convictions under subdivision (e) of section 667.6. (*Jones, supra*, 46 Cal.3d at p. 595; see *People v. Fitch* (1985) 171 Cal.App.3d 211, 214.) Here, defendant was convicted of multiple offenses specified in subdivision (e) of section 667.6: count 2, section 288, subdivision (b)(1) and counts 3, 4 and 5, section 269, subdivision (a)(1). Therefore, the court was required to impose "A full, separate, and consecutive term" for each violation of the offenses. (See § 667.6, subd. (d).)

However, the trial court erred when it designated count 2, an enumerated offense under section 667.6, subdivision (e), as the principal term and added the remaining terms, including the term for the nonenumerated section 288, subdivision (a) offense, fully consecutive under section 667.6, subdivision (d). "[W]hen a defendant is convicted of both violent sex offenses and crimes to which section 1170.1 applies, the sentences for the violent sex offenses must be calculated separately and then added to the terms for the other offenses as calculated under section 1170.1." (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 124 (*Pelayo*).) Section 667.6, subdivision (d) does not permit discretion in sentencing, and when applicable, a defendant "must be sentenced in a manner that does not dilute the impact of full, consecutive terms of imprisonment." (*Pelayo, supra*, at p. 125.) As stated, the statute "requires that the prison term imposed

41.

'shall not be included in any determination pursuant to Section 1170.1.'" (*Ibid.*) *Pelayo* explained that any "computations under sections 1170.1 and 667.6, subdivision (d) must always be done separately and the total of the section 667.6, subdivision (d) sentences added to any sentence computed independently under section 1170.1." (*Ibid.*) Here, defendant's section 288, subdivision (a) conviction under count 1 is not listed in section 667.6, subdivision (e) and therefore governed by section 1170.1. (See *Pelayo, supra*, at p. 125.) Because defendant's convictions in counts 2 through 5 are governed by section 667.6, subdivision (d), "they may not be used as components of a term calculated under section 1170.1, either as a principal term or as a subordinate term." (*Pelayo, supra*, at p. 125.)

Consequently, the sentence designating count 2 as the principal term is not authorized. Instead, the trial court had to designate count 1, the nonenumerated offense, as the principal term and impose full, separate and consecutive terms for counts 2 through 5. Although the parties did not raise this specific issue on appeal, an unauthorized sentence may be corrected at any time. (*Pelayo, supra*, 69 Cal.App.4th at p. 122; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *People v. Crooks* (1997) 55 Cal.App.4th 797, 810–811.) "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Where an unauthorized sentence exists, the appellate court may take action on its own motion to correct it, even where the parties have failed to raise the issue. (*People v. Smith* (2001) 24 Cal.4th 849, 852; accord *Dotson, supra*, at p. 554, fn. 6.) Therefore, on our own motion, we vacate the sentence and remand for resentencing. On resentencing, the trial court should calculate the appropriate term for count 1 under section 1170.1 separately, as the principal term, and add the full-term, consecutive sentences for counts 2 through 5 separately. (See *Pelayo, supra*, at p. 125.)

## DISPOSITION

Defendant's sentence is vacated. The matter is remanded for resentencing for the trial court to designate count 1 as the principal term, and to add the full term and consecutive sentences for counts 2 through 5 separately. In all other respects, the judgment is affirmed.

                                                                    MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.